UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| THOMAS ALFORD, | : | |
| | : | |
| Plaintiff, | : | |
| -against- | : | **Docket No.: 12CV7539** |
| | | **(DLC)(LMS)** |
| TURBINE AIRFOIL COATING AND REPAIR, LLC, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

.

# TABLE OF CONTENTS

Table of Authorities.................................................................   3

Preliminary Statement.............................................................   5

Summary Argument................................................................   5

Argument.............................................................................   11

    I.     Standard of Review.................................................   11

    II.    Plaintiff Has Established a Prima Facie Case of Disability
          Discrimination...................................................   12

    III.   Defendants' Actions Toward Plaintiff Were Discriminatory.......   15

    IV.   Defendants Failed to Accommodate Plaintiff's COPD..............   18

    V.    Plaintiff's Retaliation Claims.........................................   22

    VI.   Claim for Emotional Distress.........................................   23

    VII.  Conclusion...........................................................   24

## **TABLE OF AUTHORITIES**

**CASES:**

Anderson v. Liberty Libby Lobby, Inc., 477 U.S. 242, 106 S. Ct. 2505,
91 L. Ed. 2d 202 (1986)………………………………………………………… 12

Borkowski v. Valley Central School District, 63 F. 3d 131 (1995)………………… 19

Canales-Jacobs v. New York State Office of Court Administration,
640 F. Supp. 2d 482 (S.D.N.Y. 2009)…………………………………………… 19

Carlton v. Mystic Transportation, Inc., 202 F.3d 129, (2000)………………………… 16, 17, 18

Chambers v. TRM Copy Centers Corporation, 43 F. 3d 29 (2nd Cir. 1994)………… 12

Chertkova v. Connecticut General Life Insurance Co., 92 F. 3d 81 (1996)………… 19

Cleveland v. Policy Management Systems Corporation, 526 U.S. 795,
119 S. Ct. 1597 (1999)…………………………………………………………… 13

Desert Palace, Inc. v. Catharina F. Costs, 539 U.S. 90, 123 S. Ct. 2148,
156 L. Ed. 2d 84 (2003)…………………………………………………….. 12

Donnelly v. Guion, 467 F.2d 290, (2d Cir. 1972)……………………………………… 12

Garza v. Marine Transp. Lines, Inc., 861 F.2d 23 (2d Cir. 1988)…………………… 12

Howley v. Town of Stratford, 217 F.3d 141 (2d Cir. 2000)………………………… 11

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973)………… 15

Medlin v. Rome Strip Steel Co., Inc., 294 F. Supp. 2d 279 (2003)………………… 20

Montana v. Rochester, 869 F. 2d 100 (1988)…………………………………………... 18

Patterson v. J.P. Morgan Chase & Co., et al., 2004 WL 1920215 (SDNY 2004)…… 16

Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F. 3d 155 (1999)…………….. 23

Scalera v. Electrograph Systems, Inc., 848 F. Supp. 2d 352 (2012)………………… 19, 20

Warmsley v. New York City Transit Authority, 308 F. Supp. 2d 114, (2004)………. 12

Weissman v. Dawn Joy Fashions, Inc., 214 F. 3d 224 (2000)............................   22, 23

EEOC v. Yellow Freight System, Inc., 2002 WL 31011859 (SDNY 2002).............   19, 21, 22


**STATUTES:**

29 C.F.R. §§ 1630.2(o)(ii)-(iii)...…………………………………………………...   19

42 U.S.C. § 12101...……………………………………………………………...   5

42 U.S.C. § 12101(1)...……………………………………………………………   12

42 U.S.C. § 12203(a)...……………………………………………………………   22

F.R.C.P. Rule 56(a)...……………………………………………………………..   11

N.Y.S. Executive Law §291……………………………………………………   13

N.Y.S. Executive Law §296……………………………………………………   5

## PRELIMINARY STATEMENT

This Memorandum of Law is submitted by Plaintiff Thomas Alford, (Alford or Plaintiff) in opposition to Defendant Turbine Airfoil Coating and Repair, LLC's Motion for Summary Judgment. Plaintiff has established a prima facie case of disability discrimination for the period of time preceding his termination; retaliation preceding and resulting in his selection for termination as a result of his disability; and objections to Defendant TACR failing to provide accommodation.  Therefore, Defendants' motion must be denied.

In the first cause of action in the Amended Complaint, Plaintiff is suing the Defendants for discrimination in violation of the Civil Rights Laws of the United States as set forth in 42 USC §12101 et seq.

In the second cause of action in the Amended Complaint, Plaintiff is suing the Defendants for retaliation in violation of the Civil Rights Laws of the United States as set forth in 42 USC §12101 et seq.

In the third cause of action in the Amended Complaint, Plaintiff is suing the Defendants for discrimination in violation of New York State Executive Law §296.

In the fourth cause of action in the Amended Complaint, Plaintiff is suing the Defendants for retaliation in violation of New York State Executive Law §296.

## SUMMARY ARGUMENT

Plaintiff refers the Court to Plaintiff's Amended Complaint as though set forth herein.  Defendant, a joint venture between Chromalloy and Siemens, was divided along company lines into "silos."  Siemens was responsible for finance, and Human Resources, and Environmental Health and Safety ("EHS").  Chromalloy

was responsible for operations. Ben Groff and Sherri Broadwell were considered on the Siemens side over whom Wilson had limited supervisory authority. (Wilson Dep. Transcript pages 12,6-15,21; 76,8-23)

Plaintiff Alford brings claims of Discrimination, Retaliation and Intentional and Negligent Infliction of Emotional Distress relating to his former employment as a Machine Operator in the Repair and Coating Operations area of Defendant's plant in Middletown, New York. He was employed from November 2000 until his termination in June 2010, allegedly as part of a "reduction in force," which purportedly was occurring over a several year period. Regardless, at the time of Plaintiff's termination, only his position was eliminated, not three (3) as claimed by Defendants, who provide no support for such a claim outside of the Declarations of interested parties.

During his employment with Defendant Turbine Airfoil Coating and Repair ("TACR"), Plaintiff Alford who was qualified to operate APS; HVOF Ceramic; 5-Axis Milling and Plasma Machines; was assigned to the Plasma Division; and was trained to work on all three shifts that TACR operated at the time. He was further designated to be trained on the Laser drilling and shaping machines, but the commitment was not fulfilled by Defendant.

While employed by TACR, Plaintiff Alford's responsibilities included having served on the Safety Committee; training many new employees; was often called after work hours by his supervisors for assistance and advice on the machinery; for demonstrating the Plasma Machines and 5-Axis Milling Machine; and answering questions on these units during visits of potential new customers.

The fourth shift consisted of Fridays, Saturdays and Sundays. Throughout his tenure with TACR, Plaintiff Alford worked shifts one, two and three until the Plasma Division manager, Mr. Tom Snowzeir approached him with the opportunity to work the newly constructed fourth shift, which was Friday,

Saturday, and Sunday, 12 hour shifts.   Plaintiff Alford agreed to work the fourth shift and remained on that shift until his termination in June 2010.

Plaintiff Alford's work performance while with TACR at all times ranged from satisfactory to commendable and his time off was never excessive.  (Exhibits "14-18").  Plaintiff's evaluations also never make mention of any reference of hostility or aggressiveness on his part.  However, Plaintiff Alford suffered significant illness and disabilities by virtue of his job related responsibilities with TACR.  Plaintiff's believed and believes his breathing disability was either created or substantially exacerbated by the toxic substances and "powder" byproducts in the manufacturing process.  Such was also referred to in Dr. Park's medical note on March 30, 2010.  (Exhibit "5").  Plaintiff complained of such exposure as well as the need for appropriate breathing protection.  (Broadwell Dep. Transcript pages 15,1-19,22; 34,17-36,6).  Plaintiff requested such appropriate respirators that were medically recommended for him, and that the manufacturers of the substances also recommended for use while working with said materials.  (Exhibit "4").

In April 2010 Plaintiff also complained to OSHA about the lack of appropriate breathing protection that the Defendants refused to provide to their employees.  (Exhibit "7").  Following and OSHA investigation, Defendants were found to have a serious violation and failed to have a Respirator Protocol. (Exhibit "8").  This is important to the case at bar as the lack of a respirator protocol 29 CFR 134 (c)(1) includes the lack of "fit testing" procedures concerning Plaintiff directly.  Neither Plaintiff nor witnesses Werlitz or Muniz were fit tested, though Defendants were aware that they had asthma and requested and complained like Plaintiff, that the safety equipment was inadequate.

In or about 2005, Plaintiff Alford was first diagnosed with Asthma, due to his breathing in the toxic powders and chemicals associated with the machine operator position at TACR.  (Alford Dep. Transcript pages 14,4-15,13; Exhibit "5").  This would later develop into Chronic Obstructive Pulmonary Disorder

7

(COPD) in 2005.  Although he requested better ventilation and respiratory protection consistent with the Material Data Safety Sheets ("MDA") and product warning labels, neither Plaintiff nor other employees received these protections though the cost was minimal.  (Exhibit "3").

Upon Plaintiff being informed in 2005 by his pulmonologist Dr. Park of his COPD, Plaintiff demanded of Safety Manager Sherri Broadwell, and Ben Groff, the Human Resources Manager and Safety Director of his need to receive better respiratory protection so he could work safely and not breathe the particles and toxins that exacerbated his condition.  TACR only provided Plaintiff Alford with particulate filter masks, which were inappropriate for the tasks Plaintiff performed, as per even the manufacturer's recommendation and product warning labels, which reflect the minimum protection to be a half-face mask. Of course, better protection was also available, and recommended by Frank Werlitz, but ignored.  Plaintiff Alford had consistently filed Worker's Compensation Claims for injuries on the job, including respiratory from 2005.  Both Broadwell and Groff were involved in worker compensation claims.  Plaintiff's conversations with Ben Groff, detailed his disability.  Manager Groff dismissed the Plaintiff by stating that he was denying the claim and merely placed the form in Plaintiff's file, never actually filing the claim with Worker's Compensation as he was legally required, nor following up with Plaintiff Alford about his need for protective breathing equipment.  It was only subsequently, after retaining counsel, that Defendant was compelled to admit that Plaintiff had provided actual notice and causal relation of his disability to his employment.

As a result of Plaintiff's illnesses, he required multiple days off to attend doctor's appointments. Plaintiff was entitled to this time off both as a result of accrued time, as well as the Family Medical Leave Act (FMLA).  Dan Finnan acknowledged that Plaintiff was terminated due to his worker compensation

8

"excessive absenteeism." However, Plaintiff was entitled to all the time taken. (Alford Dep. Transcript pages 60,5-62,10).

Plaintiff Alford is a qualified individual with a disability who is entitled to receive accommodation relative to his workplace, encompassing from February 10, 2010 (300 days pre-EEOC filing), and October 9, 2009 (New York Statue of Limitations). The refusal to provide the Plaintiff with the equipment was a failure to accommodate. Defendants' had both actual and constructive knowledge of the harm they were subjecting their employees to, and maliciously engaged in the complained of conduct toward Plaintiff specifically, in contravention of industry standards. The Defendants' failure was both contumacious as well as a pattern and practice as demonstrated by the Affidavits of Werlitz, and Muniz.

Pursuant to the Family Medical Leave Act, Plaintiff was entitled to receive time off for treatment relating to his serious medical conditions. Plaintiff Alford was neither provided accommodations nor notification of his FMLA rights. Instead, he was advised that his termination resulted from his "absenteeism;" and his need for medical treatment. Importantly, Plaintiff Alford was advised that his separation from employment was unrelated to work performance, which is acknowledged by TACR in the Severance Agreement, including that TACR would not dispute his application for unemployment benefits. (Exhibit "13").

Defendant also claims that the Plaintiff was terminated due to the company abolishing the fourth shift, and that Plaintiff was the only employee on the fourth shift purportedly unable to operate laser machinery. Such is false. Plaintiff was recommended for laser training in his year 2008 performance evaluation, though was never trained. (Exhibit "14"). However, Plaintiff was qualified and had more seniority than the two other employees on the fourth shift. Notably, some of Plaintiff's former co-workers are currently employed by TACR during the still existent "fourth shift," which was changed in name only.

9

In March 2010, after being diagnosed with COPD, Plaintiff filed a complaint with OSHA listing over twenty-five safety violations and/or concerns, many related to the toxic chemicals, powders, and lack of safety equipment and breathing apparatus. In response to the complaint, OSHA came to inspect the plant at TACR and the equipment in question was cleaned or repaired. OSHA cited Defendants for failing to have a respirator protocol. (See Exhibits "7 and 8"). Notwithstanding, Plaintiff's complaints are supported by witnesses Werlitz and Muniz.

Thereafter, Plaintiff Alford suffered the continuing discrimination and retaliation that forced him from employment. Before his illnesses and complaints, he was an above satisfactory performer and received positive performance reviews. It was only after his COPD diagnosis and persistent demand for better respiratory protection. Notably, after being "fit" tested he was disciplined. Such discipline occurred after, and was disparate to others as it was neither an uncommon error that he was disciplined for, nor related to operator misfeasance. TACR's and Plaintiff's supervisors and co-worker's actions toward Plaintiff was retaliatory and caused significant emotional distress to him. Defendant's actions in failing to provide accommodation, have rendered Plaintiff permanently disabled, suffering from incurable COPD, which could have been prevented or ameliorated by the accommodation that was refused.

On June 28th, 2010 the Plaintiff was summoned to the plant managers office, accompanied by his supervisor Richard Fernandez, and was told he was being terminated from employment by Plant Manager Dan Finnan. He was given a severance agreement to sign. Plaintiff Alford was advised by Finnan that he was "targeted" for separation by virtue of his medical history. He was advised that others volunteered to be laid off, such as Oscar Muniz, though their requests were refused. Consequently, such conduct indicates the improper motivation for the discrimination and retaliation relative to the designation of Plaintiff Alford for termination. Interestingly, Defendants claim such meeting never occurred. However, Plaintiff's ID card was

10

taken by Mr. Finnan and Plaintiff had to be "buzzed" in when he returned as directed to meet with Ben Groff on July 2, 2010.  Plaintiff was then terminated, (Exhibit "12"), and a severance agreement offered, (Exhibit "13").

## ARGUMENT

Plaintiff, by and through his counsel, Ranni Law Firm, submits this memorandum of law in conjunction with the documents attached hereto and the documents that have been previously attached and incorporated by reference to the underlying complaint and amended complaint, as well as the documents submitted by Defendant, in opposition to Defendants Motion for Summary Judgment in the above-referenced matter.

## STANDARD OF REVIEW

F.R.C.P. Rule 56(a) provides that summary judgment should only be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In deciding whether there is a triable issue of material fact, "the court is required to resolve all ambiguities and to credit all factual inferences that could rationally be drawn, in favor of the party against whom summary judgment is sought."

Howley v. Town of Stratford, 217 F.3d 141, 150, 151 ($2^d$ Cir. 2000).

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Libby Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513, 91 L. Ed. 2d 202, 216 (1986).  Summary judgment is a "drastic procedural weapon because

11

'its prophylactic function, when exercised, cuts off a party's right to present his case to the jury.'" <u>Garza v. Marine Transp. Lines, Inc.</u>, 861 F.2d 23, 26 (2<sup>d</sup> Cir. 1988) (quoting <u>Donnelly v. Guion</u>, 467 F.2d 290, 291 (2<sup>d</sup> Cir. 1972)).

As the summary judgment standard has been applied to cases of employment discrimination, the burden of proof that must be met to permit the Plaintiff to survive a summary judgment motion at the prima facie stage is de minimis. <u>Chambers v. TRM Copy Centers Corporation</u>, 43 F. 3d 29, 37 (2nd Cir. 1994). Where circumstances raise an issue of fact concerning whether an unlawful motive played a part, the case must go to the jury. <u>See gen.</u>, <u>Desert Palace, Inc. v. Catharina F. Costs</u>, 539 U.S. 90, 123 S. Ct. 2148, 156 L. Ed. 2d 84 (2003).


## PLAINTIFF HAS ESTABLISHED A PRIMA FACIE CASE OF DISABILITY DISCRIMINATION

"In order to make out an ADA claim, the plaintiff must show that: (1) his employer is subject to the ADA; (2) he is disabled under the ADA; (3) he is otherwise qualified to perform the essential functions of the job with or without a reasonable accommodation; and (4) he suffered an adverse employment action because of his disability." <u>Warmsley v. New York City Transit Authority</u>, 308 F. Supp. 2d 114, 119 (2004). Plaintiff has presented evidence that he suffers from a disability as defined under the ADA.  Under the ADA "disability" means, with respect to an individual:  (1) a physical or mental impairment that substantially limits one or more major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment. <u>42 U.S.C. § 12101(1)</u>.  Plaintiff was diagnosed with Asthma which developed into COPD or Chronic Obstructive Pulmonary Disease over the years Plaintiff worked for Defendants.  COPD is characterized by obstruction of lung airflow that interferes with normal breathing. Plaintiff's Asthma and COPD clearly impose limitations on major life activities.

12

Defendants' claim that regardless of whether Plaintiff's respiratory limitations qualify as a disability under the ADA, Plaintiff is disqualified due to his application for disability benefits under the Social Security Administration ("SSA"), which were ultimately granted on or about June 19, 2010. However, "pursuit, and receipt of SSDI benefits does not automatically estop a recipient from pursuing an ADA claim, or erect a strong presumption against the recipient's ADA success," so long as the consistency of the contentions is explained. Cleveland v. Policy Management Systems Corporation, 526 U.S. 795, 797; 119 S. Ct. 1597 (1999). In determining whether an individual is disabled under SSDI, the SSA "does not take the possibility of 'reasonable accommodation' into account, nor need an applicant refer to the possibility of reasonable accommodation." Cleveland, at 803. Notwithstanding, Plaintiff's discrimination claims *precede* his SSDI application. As Plaintiff filed his EEOC Charge of Discrimination on December 7, 2010, the 300 day look back period is on or after February 10, 2010. Similarly, as this matter was filed on October 9, 2012, under New York State Executive Law § 291, there is a three (3) year look back, and Plaintiff's claims are compensable on or after October 9, 2009.

Plaintiff Alford's ADA claim that he could perform his job with Defendants with reasonable accommodation does not prove inconsistent with his SSDI claim that he could not perform his job without reasonable accommodation. As in Cleveland, the purported discrepancy is easily explained in that Plaintiff Alford's statements to SSDI that he was disabled was made to "a forum which does not consider the effect that reasonable workplace accommodations would have on the ability to work." Cleveland, at 807. However, Plaintiff Alford always contended that he would still be able to 'perform the essential functions' of his job with the accommodation that he had requested, had Defendant ever provided it, or adequately considered same as part of the interactive process. Instead, as Environmental Health and Safety Coordinator ("EHS") Broadwell stated "if it was not required for the job it wasn't considered." (Broadwell Dep.

13

Transcript pages 34,17-39,18) Her review, despite Plaintiff's complaints, and those of Muniz and Werlitz, was solely what she believed was required. That conclusion, as directed by Groff, was to provide particle masks instead of, at least, the half-face mask shown on the MDS and product warning labels. Thus, Defendants' claim that Plaintiff Alford's representations of disability to the SSA foreclose his disability claims under the ADA is inherently false, and summary judgment should not be granted on this basis.

Defendants' defense is predicated, inter alia, that Plaintiff didn't request an accommodation until March 30, 2010; that they attempted to accommodate by sending him for a "fit" test that Plaintiff failed; and then reassigned him away from gritting machines, which just happened to be part of the "repair" process; and reassign him to duties consistent with his COPD.

Defendant ignores that Plaintiff's claims concerning the failure to accommodate pre-date that statutes of limitations that apply, and continued up to and including his selection for termination.

The fit test was a ruse. Firstly, he was not sent with or provided the respirator for which he was to be fit tested, as Broadwell testified would be necessary. Plaintiff is further able to demonstrate the testing Plaintiff underwent was inconsistent with what is required in a fit test. (Werlitz Affidavit; Expert Report Exhibit "19"). Regardless, Plaintiff was clearly not considered for the multitude of options (Exhibit "3"), including positive pressure air systems. Notably, Defendants' co-located "sister" company, ACT which is a joint venture between Chromalloy and Pratt & Whitney, performed the same or similar functions as Defendants and their employees, among them, Plaintiff Alford, and Plaintiff's witnesses Muniz and Werlitz. However, unlike Defendants, ACT had proper safety equipment, ventilation, and respirators. The only difference being that TACR was a joint operation with Siemans, who controlled the purse strings.

Wilson testified that Siemans started pulling out beginning in 2009, and the joint venture dissolved in April 2010. Consequently, it is not difficult to believe Ben Groff refused to authorize purchases of

14

ventilation equipment or respirators beyond the laser machines. Mr. Groff's Affidavit is particularly curious in its' brevity. Despite the extensive testimony of Wilson and Broadwell as to Groff's responsibilities and direct involvement in EHS and Human Resources activities, only a brief sixteen (16) paragraph affidavit of conclusory statements was provided, side stepping the important factual issues concerning Plaintiff's prior complaints; Groff's knowledge of Plaintiff's medical condition; Plaintiff's requests for accommodation; and the reasons Plaintiff was offered a purported "Severance" Agreement.

Shortly after Plaintiff was terminated, Ben Groff was terminated for directing a straw man to take a safety qualification test for another person and misrepresent the results to a governmental agency. (Wilson Dep. Transcript pages 79,6-82,22). Consequently, the Affidavit of Groff is not worthy of credibility and his declaration should be rejected in toto.

## DEFENDANTS' ACTIONS TOWARD PLAINTIFF WERE DISCRIMINATORY

The basic prima facie case of employment discrimination involves showing (1) membership in a protected class; (2) qualification for the position; (3) an adverse employment action; and (4) circumstances suggesting discrimination. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973). Plaintiff's burden is minimal, and Plaintiff can set forth evidence of pretext for purposes of establishing a prima facie case.

Defendants articulate that Plaintiff was primarily terminated as part of at least seven waves of reductions in force due to Defendants' business declines and a drop in sales of approximately 50% between 2009 and 2010. Defendants claim that secondarily Plaintiff was terminated due to attendance, performance, limited skills and prior record. Yet Defendants do not present any admissible contemporaneous evidence of

15

declining revenue; no evidence of the evaluative process utilized in determining what employees to terminate and in what "wave" they were to be terminated; and no record of Plaintiff's inadequate work performance.

While a reduction in force can be a valid non-discriminatory reason for discharge, "simply stating that a reduction-in-force was the reason for an employee's termination, however, does not inoculate a defendant against a claim of discrimination." Patterson v. J.P. Morgan Chase & Co., et al., 2004 WL 1920215 (SDNY 2004). "Even within the context of a legitimate reduction-in-force, ... an employer may not discharge an employee 'because' of" a discriminatory reason. Carlton v. Mystic Transportation, Inc., 202 F.3d 129, 136 (2000).

Concerning the Reduction in Force ("RIF") "waves" asserted by the Defendants, absolutely no documentary support of the purported loss of business; shift in business from OEM to repairs; RIF plan; employee selection; or whether severance packages were offered was ever provided by Defendants. No documentation was produced of employee seniority; training/certification; and/or disciplinary or performance history. Notably, Defendants never identify the purported two (2) other employees who were fired in the "wave" with Plaintiff.

While Defendants claim a reduction-in-force was necessary to stabilize finances, and was the primary motivating factor behind Plaintiff's termination, Defendants actions belie their words. Defendants state that as part of the "shuttering of the Fourth Shift," on which Plaintiff was working at the time of termination, Plaintiff was recommended for layoff. However, the Fourth Shift was never "shuttered," as workers continued to work on Fridays and weekends performing the same duties as before. (Muniz Affidavit). In addition, just prior to Plaintiff's termination, Plaintiff's co-worker Oscar Muniz, whose salary was commensurate with Plaintiff's, volunteered to be laid off due to his own declining health from breathing the toxic dust and particles while employed with the Defendants. Defendants rejected Mr. Muniz's offer and

16

instead targeted Plaintiff for termination. As Plaintiff testified, Dan Finnan told him at the time he was being fired because of his medical condition.

Defendants' other assertions that Plaintiff was terminated in part due to attendance, job performance, limited skills, and prior record are also pretext. As in the Plaintiff in <u>Carlton</u>, where summary judgment was not granted, Plaintiff "never received a negative written performance evaluation or formal warning, nor is there any writing whatsoever criticizing his job performance." <u>Carlton</u>, at 137. While Plaintiff concedes that in April 2010 he was suspended for one day purportedly for incorrectly machining a part as Defendants contend, this was not an uncommon occurrence, and discipline never imposed. (Werlitz Affidavit). Notwithstanding, the error occurred because the customer specifications changed mid-stream, requiring what had been done to be re-done. Notably, this occurred while Plaintiff was performing parts machining, which is related to repair, not OEM. As to Plaintiff's limited skills, including the fact that he was not trained or certified in laser or HVOF machine operation, Defendants' contentions are partially untrue. Plaintiff was trained and certified in HVOF machine operation, and none of the laser machine operators had been trained or certified either until being assigned that position following the purchase of the laser machines which was delayed by Siemens and only delivered in early 2010. Though Plaintiff was recommended for that training in his 2008 evaluation, (Exhibit "14"), he was not trained.

"Objective evidence indicates that plaintiff was performing his job adequately." <u>Carlton</u>, at 137. As stated previously, Plaintiff had served on the Safety Committee; was responsible for training many new employees; was often called after work hours by his supervisors for assistance and advice on the machinery; and was responsible for demonstrating the Plasma Machines and 5-Axis Milling Machine; as well as demonstrating the machines and answering questions on these units during visits of potential new customers,

among his other responsibilities. Notably, the only discipline occurred after he complained about the respirators and demanded accommodation.

When viewed as a whole, the circumstances surrounding Plaintiff's pretextual termination from employment create a triable issue of fact, not ripe for summary judgment. See Montana v. Rochester, 869 F. 2d 100 (1988). "Because this is a discrimination case where intent and state of mind are in dispute, summary judgment is ordinarily inappropriate." Carlton, at 134. "Trial courts must be especially chary in handing out summary judgment in discrimination cases, because in such cases the employer's intent is ordinarily at issue … since it is rare indeed to find in an employer's records proof that a personnel decision was made for a discriminatory reason." Chertkova v. Connecticut General Life Insurance Co., 92 F. 3d 81, 87 (1996). "To hold otherwise would effectively insulate an employer from the constraints of federal antidiscrimination law during any structural reorganization or reduction in force." Montana, at 106. Each of these "reasons" put forth by Defendants for Plaintiff's termination are demonstrably pretextual. The motivating reason Plaintiff was terminated was his COPD, a disability that did not occur relative to any other of Defendants' employees, and the additional cost of accommodating Plaintiff and his disability.

## DEFENDANTS' FAILED TO ACCOMMODATE PLAINTIFF'S COPD

Defendants violated the ADA and the NYSHRL by failing to engage in the interactive process with Plaintiff and failing to provide him with an accommodation for his COPD. Defendants dispute this by claiming the Plaintiff, as well as all other employees, "had access to" an N95 particulate facemask. The fine dust particles that Defendants' employees, including Plaintiff, were and are exposed to while performing their jobs are not adequately filtered by the N95 mask. There is no seal formed by the mask around the nose and mouth, thus even when wearing the mask, the fine dust particles are inhaled from around the edges of the

18

mask. The masks do not conform with the product recommendations, and are hardly adequate for any employees working the coating machinery at Defendants' facilities, much less an employee with Asthma or COPD, like Plaintiff.

Under the ADA, the employer must make reasonable accommodation for an employee's disability. "The term 'reasonable accommodation' means 'modifications or adjustments to the work environment ... that enable an individual with a disability who is qualified to perform the essential functions of that position' as well as 'modifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities.'" Scalera v. Electrograph Systems, Inc., 848 F. Supp. 2d 352, 367 (2012); 29 C.F.R. §§ 1630.2(o)(ii)-(iii). The N95 particle masks are not N95 respirators, which are half-face masks with N95 cartridges. The particle masks were not reasonable in that they were not effective and did not protect the Plaintiff from the very dust and particles that caused his disability to progress from Asthma to COPD, but in fact exacerbated his breathing difficulties with the addition of more and more dust and particles being inhaled on a daily basis. An "accommodation must allow employee[s] to work in 'reasonable comfort.'" EEOC v. Yellow Freight System, Inc., 2002 WL 31011859, at 21 (SDNY 2002). Furthermore, "an accommodation that aggravates the symptoms of a disability, rather than mitigates their effect on the employee's ability to perform, is no accommodation at all." Id.

Plaintiff requested a HEPA respirator, and Plaintiff's physician Dr. Park, sent a letter to Defendants requesting the same accommodation. Plaintiff merely needs to "suggest the existence of a plausible accommodation." Scalera, at 366, citing Borkowski v. Valley Central School District, 63 F. 3d 131, 138 (1995). However, "the issue of whether an accommodation is reasonable is normally a question of fact, unsuited for a determination of summary judgment. Scalera, at 367, citing Canales-Jacobs v. New York

19

State Office of Court Administration, 640 F. Supp. 2d 482, 500 (S.D.N.Y. 2009). "All Plaintiff needs to show is that the requested accommodations were reasonable and connected to h[is] disability." Scalera, at 368.

Knowing that the N95 particle masks provided by Defendant did not filter the air Plaintiff and others were breathing, Plaintiff then requested a half face-mask respirator. Defendants claim that although under OSHA regulations the N95 particulate mask was sufficient, Defendants purportedly still attempted to accommodate the Plaintiff's disability and honor his request, however their efforts were thwarted by Plaintiff's failure to pass the fit test. Defendants' argument fails on many levels.

Firstly, while Plaintiff suggested an appropriate accommodation for his disability was a HEPA respirator or a full or half face-mask respirator with positive pressure, "it is not incumbent on plaintiff to specifically request any and all accommodations that could possibly be reasonable." Medlin v. Rome Strip Steel Co., Inc., 294 F. Supp. 2d 279, 292 (2003). "The regulations do not require … that the terminated employee request the specific accommodations that he or she complains the employer did not provide in order to trigger the employer's obligation to investigate the sort of reasonable accommodations that might be appropriate for the employee." Medlin, at 292. In the case at bar, once Defendants determined that Plaintiff was not purportedly eligible for a full or half face-mask respirator, they seemed to erroneously believe that they were absolved from any further obligation to accommodate the Plaintiff's disability, or even investigate what other options were available for the Plaintiff.

Secondly, Defendants did already possess at least one full face-mask respirator that the Plaintiff requested. Said respirator was stationed in the "acid room," and was shared by all employees while working in that station, including the Plaintiff. While Defendants found issue with Plaintiff's ability to utilize a full face-mask respirator when doing so would require them to purchase an additional one for him, they had no

issue with him using that same respirator, regardless of the "fit test" results, so long as it was the one already at the facility. Such motivation is disingenuous at best, and clearly demonstrates how this argument is specious at worst.

Thirdly, as part of the ADA regulations, employers are obligated to participate in an interactive process in determining what reasonable accommodation is best suited to employee and employer alike. "Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability." Medlin, at 292

The regulations contemplate a problem solving approach where the "process involves 'meet[ing] with the employee who requests an accommodation, request[ing] information about the condition and what limitations the employee has, ask[ing] the employee what he or she specifically wants, show[ing] some sign of having considered [the] employee's request, and offer[ing] and discuss[ing] available alternatives when the request is too burdensome." EEOC v. Yellow Freight, at 23. Plaintiff Alford was never afforded this interactive process, and Defendants have provided no evidence that any such steps were taken. Plaintiff was merely given an unsuitable particulate mask, with nothing more because according to the analysis of Broadwell and Groff, purportedly OSHA deems it the minimum acceptable, and Plaintiff was then told by the Defendants that their obligation was satisfied. "This adversarial, rigid adherence to [a] policy is 'the antithesis of participation in the interactive process.'" EEOC v. Yellow Freight, at 24.

Defendants even tacitly admit that they failed to partake in the interactive process. In their papers for summary judgment, they do not claim that they involved themselves and the Plaintiff in an interactive process geared towards finding him a suitable accommodation, but instead argue that "the ADA does not

21

recognize an independent cause of action for failure to engage in this interactive process." See Defendant's

Motion for Summary Judgment, page 21.   However, Plaintiff is not putting forth that the lack of the

interactive process should be an independent source of liability.  The failure to engage in an interactive

process is only irrelevant where a reasonable accommodation is offered, and as has been clearly shown,

Plaintiff Alford was never offered a reasonable accommodation by the Defendants which would trigger the

lack of necessity for the interactive process. See EEOC v. Yellow Freight, at 24.  "Plaintiff is not asking the

Court to hold … that Defendants failure to participate in the interactive process subjects it to liability …

rather … consider this failure simply as an indication of why [Defendants offer] falls short of constituting an

offer of reasonable accommodation."   EEOC v. Yellow Freight, at 24.

     Regardless, Defendants' motivation is demonstrated in their similar failure to address the same or

similar objections from Muniz and Werlitz.


## PLAINTIFF'S RETALIATION CLAIMS

     Defendants mischaracterize Plaintiff's claim and argue Plaintiff cannot establish a prima facie case of

retaliation because purportedly neither Plaintiff's worker compensation claims nor his complaint to the

Occupational Safety and Health Administration ("OSHA") constitute protected activity under the ADA.

However, regarding retaliation under the ADA, "no person shall discriminate against any individual because

such individual … made a charge, testified, assisted, or participated in any manner in an investigation,

proceeding, or hearing under this chapter."  42 U.S.C. §12203(a).

     As in the case at bar, Weissman v. Dawn Joy Fashions, Inc., 214 F. 3d 224, 234 (2000), puts forth

how where even if a Plaintiff does not prove that there was a violation of the ADA, the Plaintiff could still

show retaliation against him for engaging in protected conduct. "A plaintiff need not establish that the

22

conduct he opposed was actually a violation of the statute so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged activities of the employer violated th[at] law." Weissman, at 234, citing Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F. 3d 155, 159 (1999).

Plaintiff reasonably believed that beyond Defendants refusing to provide appropriate accommodations, Plaintiff made similar complaints toward Defendants' activities that he challenged by complaining to OSHA and making a claim to worker compensation relating to his disability.  Such complaints related to Defendants retaliating against Plaintiff for engaging in protected activity by suspending, transferring and terminating him.  There is no dispute that Defendants were aware of Plaintiff' Asthma condition in 2005, and continuing treatment though worker compensation.  Broadwell testified at length about Plaintiff's complaints; that Plaintiff demanded accommodation and Defendant responded with a pretextual suspension; that Plaintiff was transferred instead of being given a respirator; and that ultimately the position that he was transferred to was to be eliminated.

## CLAIM FOR EMOTIONAL DISTRESS

While Plaintiff sought and received remedy for his physical injuries through New York's workers compensation law, his claims herein are based on the emotional distress he suffered due to Defendants' failure to accommodate his disability and are thus not barred by his workers compensation claims.

Compensatory damages for the mental and emotional distress that occurred due to Defendants' failure to accommodate him are available under the ADA, separate from the physical injuries that Plaintiff obtained during employment with the Defendants.  It is not whether the Plaintiff can make a claim for emotional distress that could be questioned, but the amount of damages allowable for said emotional distress. Regardless, the amount of damages is not an issue to be decided in a motion for summary judgment and as a

23

result, Defendants' motion for summary judgment must be denied in its entirety.

## V. CONCLUSION

Based on the foregoing, plaintiff respectfully requests this Court deny Defendant's Motion for

Summary Judgment be denied, in its entirety and for such other and further relief the Court deems just and

proper.

Dated: November 15, 2013
Florida, New York

Joseph J. Ranni, Esq. (Bar No.: 511592)
RANNI LAW FIRM
148 N. Main Street
Florida, New York 10921
(845) 651-0999
*Counsel for Plaintiff*

24