UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- X
                                      :
THOMAS ALFORD,                        :
                                      :      12 Civ. 7539 (DLC)
                 Plaintiff,           :
                                      :      OPINION AND ORDER
        -v-                           :
                                      :
TURBINE AIRFOIL COATING & REPAIR, LLC, :
                                      :
                 Defendant.           :
                                      :
------------------------------------- X

APPEARANCES

For the Plaintiff:

Joseph J. Ranni
Ranni Law Firm
148 N. Main Street
Florida, NY 10921


For the Defendant:

Erin Carney D'Angelo
DLA Piper LLP (U.S.)
1251 Avenue of the Americas
New York, NY 10020


DENISE COTE, District Judge:

     Thomas Alford ("Alford") brings this disability

discrimination suit against his former employer, Turbine Airfoil

Coating & Repair, LLC ("TACR").  Alford was diagnosed with

chronic obstructive pulmonary disease ("COPD") on or about March

2010.  He alleges that, through the events leading up to his
discharge in June 2010, TACR discriminated and retaliated
against him due to his disability, in violation of the Americans
with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and
the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law
§ 290.  TACR moved for summary judgment.  During 2010, TACR
reduced its workforce from 159 employees to 89 through seven
rounds of layoffs.  Alford lost his job during the third round
of layoffs.  For the reasons set forth below, the motion for
summary judgment is granted.

BACKGROUND

     The following facts are undisputed, or taken in the light
most favorable to the plaintiff.  TACR was formed in June 2000
as a joint-venture between Chromalloy Gas Turbine, LLC
("Chromalloy") and Siemens Westinghouse Power Corporation
("Siemens").  Siemens manufactures gas turbine engines,
including jet engines for aircraft.  The engines rotate a series
of blades.  Chromalloy is a specialist in such blades.  It both
repairs the protective thermal coating applied to these blades
and manufactures new blades, known as Original Equipment
Manufacturer ("OEM") work.  Siemens and Chromalloy created TACR
so that Siemens would provide a continuous supply of turbine

engines to be repaired, and meanwhile Chromalloy could continue its OEM work in manufacturing new blades. TACR was based at a pre-existing Chromalloy facility in Middletown, New York.

To repair and manufacture turbine blades, TACR used at least three different processes. One involved coating machines called Low Pressure Plasma Spray ("LPPS") or Air Plasma Spray ("APS"). Another involved a High Velocity Oxygen Fuel ("HVOF") machine, which involved a different method of coating than LPPS or APS and required a specifically trained operator. A third involved laser drilling and welding (collectively referred to as "laser"), which also required a specifically trained operator.

Alford was hired in 2000 as a machine operator. Alford developed an expertise with the LPPS and APS procedures. His experience in HVOF was more limited. Alford was never certified in the laser process.

Alford's job generally consisted of moving blades from a cart, weighing them, loading them into the coating machine, operating the coating machine, and then unloading the blades. For eight hours each day, Alford was required to reach, to handle, grab, or grasp large objects, and to handle small objects. He was frequently required to lift ten pounds and occasionally required to lift 75 to 80 pounds. Additionally, his job required standing for six hours and sitting for two

hours, with one hour of walking.

Between 2000 and 2010, Alford received two warnings for his workplace conduct.  In 2005, in response to allegations that he threatened some employees, Alford was suspended for one month and referred to a psychiatrist.  In 2008, in response to an allegation that he threatened a co-worker, Alford was sent to a psychiatrist.[1]  Other than these two incidents, Alford's performance reviews ranged from satisfactory to commendable.  In 2010, Alford was working as an APS operator.

Alford's COPD

On or about March 20, 2010, Alford was diagnosed with COPD. COPD is a lung disease that makes it hard to breathe.  Alford submitted to TACR a letter from his doctor, dated March 30, which stated that Alford has COPD and requires medical treatment, and that the disease may be occupation-related.  This letter did not state that Alford's COPD required any accommodation, although Alford contends that he requested a respirator from his supervisors.

On or around April 13, Alford filed a claim for worker's

---

[1] Alford objects that the basis for these facts is hearsay.  This Opinion makes no assessment of the truth of the allegations. The fact that these allegations were made and the company's response to these allegations are not hearsay.

compensation with the New York Worker's Compensation Board relating to his COPD diagnosis.  On or around April 29, Alford submitted a complaint to the Occupation Safety and Health Administration ("OSHA") regarding the workplace conditions at TACR, including inadequate ventilation, lack of respiratory protection, and insufficient sound protection.  This led to an OSHA inspection, and OSHA eventually penalized TACR in the amount of $975 because "[TACR's] written respiratory program was not established for employee required to wear a 3M full-face respirator while working in the Acid Room."  The acid room was the only place where employees were required to wear respirators.  Alford did not work in the acid room.

In a letter dated May 17, 2010, Alford's doctor recommended that Alford use a "HEPA respirator" during work "to minimize chemical and dust exposure."  This was the first time that TACR received medical documentation stating that Alford's COPD required accommodation.

In response to the May 17 letter, Ben Groff ("Groff"), the Human Resource and Environmental Health and Safety Manager at TACR, arranged for Alford to undergo a medical evaluation to determine if Alford was able to use the respirator.  OSHA regulations state that "[t]he employer shall provide a medical evaluation to determine the employee's ability to use a

respirator, before the employee is fit tested or required to use the respirator in the workplace." 29 C.F.R. § 1910.134(e)(1). The evaluation was performed by Chrystal Run Healthcare, where Alford had periodically undergone exams and tests during his time at TACR.

Alford failed the medical examination. In a one-page report dated May 21, the Chrystal Run Healthcare examiner stated that a "respirator clearance exam" in accordance with OSHA regulation 29 C.F.R. § 1910.134 had been performed on Alford and that he was not medically certified to wear a respirator in the performance of his job. The report further stated that Alford's spirometry results (which are measures of one's breathing capacity) did not meet OSHA's minimum levels.

On the same day, May 21, Groff emailed Alford's supervisors -- including Dan Finnin ("Finnin"), Plant Manager -- to inform them of the test results and instructed them that Alford should not operate a machine in areas with high levels of dust. Groff, Finnin, and other TACR supervisors changed Alford's duties to eliminate "grit blasting" from his required tasks.[2]

_____

[2] While Alford argues that his employer continued to require him to work in dusty areas, he has not cited to any admissible evidence to support that argument, and the Court's own separate review of the record submitted by the parties does not disclose such evidence. Affidavits from other employees describing housekeeping practices generally is insufficient to raise a

Approximately one month later, on or about June 19, Alford injured his shoulder by tearing his rotator cuff.  This was an exacerbation of a prior shoulder injury.  As a result of this injury, Alford ceased coming to work.  In late June 2010, TACR laid off Alford and others in the third round of layoffs that are further described below.  Alford was informed of this decision on July 2, 2010.

At some point, Alford applied for Social Security Disability Insurance ("SSDI") benefits.  In his disability report, Alford stated that he stopped working on June 19, 2010 due to the following twelve conditions:

1.  Back
2.  COPD
3.  Asthma
4.  Sleep Apnea
5.  High Blood Pressure
6.  Left shoulder
7.  Diabetes
8.  Left wrist – carpal tunnel
9.  Lumbar and cervical herniated discs
10. [L]ymphedema – both legs
11. Ulcer – non-healing left leg
12. Morbid obesity

Alford further stated that, due to these conditions, he made a change in his work activity on March 19, 2010.  Later in the report, Alford listed eighteen prescription drugs that he was taking.  He also listed eight doctors as having medical

---

question of fact on this score.

information regarding his conditions.

In a decision dated August 20, 2012, the Social Security Administration ("SSA") found that Alford was "disabled" (as relevant for purposes of SSDI benefits) as of June 19, 2010. The SSA concluded that Alford "lacks the residual functional capacity to perform even sedentary work . . . on a sustained, full-time basis."  In reaching this conclusion, the SSA made, as relevant here, the following findings:

- The objective medical evidence documents a myriad of chronic disorders with involvement of practically all major body systems, the cumulative effect of which precludes the claimant from lifting/carrying more than 10 pounds.  During the course of an 8-hour workday, he cannot stand and/or walk for more than 2 hours, or sit in excess of 6 hours.  He cannot perform fine or gross manipulations with the bilateral hands on greater than an occasional basis.  He has at least occasional postular restrictions in terms of stooping, crouching, kneeling, crawling, and climbing.
- He needs to avoid concentrated exposure to dust, fumes, other pulmonary irritants, and temperature/humidity extremes due to his severe asthma.
- He should also avoid exposure to workplace hazards such as unprotected heights and moving machinery due to his sleep apnea.
- An independent medical examination . . . in October 2010 . . . described [Alford] as being morbidly obese, with a weight measurement of 365 pounds at a height of 70 inches.  He became acutely short of breath when asked to breathe fully and expire with force. . . . [Alford was assessed] with reactive airway dysfunction superimposed upon severe restrictive lung disease caused by morbid obesity. It was opined that [Alford] manifested a marked

partial disability that would not allow him to travel and would restrict him for performing even mild work activity.

- An MRI study of the lumbar spine undertaken in November 2010 showed a paracentral L5-S1 disc herniation with a mild bilateral neural foraminal narrowing, with diffuse broad-based disc bulging at L4-5.  MRI studies of the right knee and left shoulder evidenced low T1 marrow signals . . . .

- EMG/NCV studies performed in September 2011 produced results that were consistent with bilateral carpal tunnel syndrome . . . .

- [Alford] was deemed to have a marked limitation for bending and lifting; with moderate restrictions in terms of walking, standing, and prolonged use of both hands for fine and gross manipulations.

- [At the previous level of administrative review] evaluators likewise found that [Alford] was incapable of performing a full range of sedentary work.

Having made these findings -- in particular, Alford's inability to perform even sedentary work and his limitations with respect to standing, walking, bending, carrying, and lifting -- the SSA further concluded that Alford was unable to perform any past relevant work (including being a machine operator) and that there are no jobs that exist in significant numbers in the national economy that he could perform.  Alford was thus granted benefits retroactive to June 19, 2010, the alleged onset of his disability.

TACR's 2010 Layoffs

Between 2009 and 2010, TACR's sales declined by

approximately 50%.  TACR's Board of Directors ("Board") directed the Chief Executive Officer of TACR to make cuts to staff.

During 2010, TACR had seven rounds of layoffs.  After the first round in March, the Board decided to wind down the joint-venture, shut down TACR, and absorb any remaining staff into Chromalloy.  Overall, TACR began 2010 with 159 employees working five shifts and ended with 89 employees working three shifts -- a decline of 70 employees, or 44% of the staff.[3]  TACR laid off 53 employees, including 17 of 34 machine operators, and another 17 positions were lost due to attrition, including 1 machine operator.

By 2010, TACR's business had begun to shift toward HVOF and laser processes.  Predicting that future business would also be concentrated there, TACR decided that it would have less need for LPPS and APS machine operators.

The first two rounds of layoffs occurred in March and April of 2010.  Twenty-five employees, including eight machine operators, were laid off.  Although these layoffs included two of the three LPPS/APS operators on the same shift as Alford, and although Alford was considered for these rounds of layoffs, he was not laid off.  Alford's shift was the fourth shift; it required him to work Friday through Sunday.

_____

[3] As of today, the successor business has 67 employees.

The third round of layoffs occurred in June 2010, consisting of three employees, of which two were machine operators, including Alford.  By that time, Alford was the only remaining LPPS/APS machine operator on the fourth shift; Alford was at the time working on an APS machine.  As already noted, Alford had limited experience with HVOF and was not certified for the laser process.  TACR had already laid off the other LPPS/APS machine operators on Alford's shift, and TACR decided to eventually shut down both the fourth and fifth shift.  TACR asserts that Alford's disciplinary record, while not dispositive, was also a factor in his discharge.

TACR experienced four more rounds of layoffs: in July, August, October, and November.  In these remaining rounds, twenty-five employees were laid off, including seven machine operators.  The fourth and fifth shifts were then closed down entirely.

Because Alford had not been coming to work after tearing his rotator cuff on June 19, 2010, he was not informed of his discharge on June 25, when the other two employees in the third round of layoffs were so informed.  TACR called him into work on July 2, and advised him that he was being laid off.

On October 9, 2012, Alford brought this action, which was reassigned to this Court on December 21.  On September 25, 2013,

a joint stipulation was endorsed permitting the filing of an amended complaint that would more accurately state Alford's claims.  The amended complaint was filed on October 1, and it asserts four claims: two claims of disability discrimination and retaliation under the ADA, and two identical claims under the NYSHRL.

On September 27, TACR moved for summary judgment.  The motion as fully submitted as of December 13.[4]

DISCUSSION

Summary judgment may not be granted unless the submissions of the parties taken together "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  The moving party bears the burden of demonstrating the absence of a material fact question, and in making this determination the court must view all facts in the light most favorable to the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323

---

[4] At the close of the period for fact discovery, Alford sought an extension of the period to obtain certain additional documents from the defendant.  The request was opposed, and it was denied. Alford has not provided a Rule 56(d) affidavit, Fed.R.Civ.P., or otherwise argued in opposition to this motion for summary judgment that there is any evidence to which he must have access in order to succeed in this opposition.

(1986).  When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on mere "allegations or denial" of the movant's pleadings.  Fed.R.Civ.P. 56(c); Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010).  "[C]onclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment."  Ridinger v. Dow Jones & Co. Inc., 651 F.3d 309, 317 (2d Cir. 2011) (citation omitted).

In cases involving claims of employment discrimination "an extra measure of caution is merited" in granting summary judgment because "direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions."  Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006) (citation omitted).  Nonetheless, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment."  Holcomb v. Iona College, 521 F.3d 130, 137 (2d Cir. 2008).  Ultimately, the test for summary judgment "is whether the evidence can reasonably support a verdict in plaintiff's favor."  James v. N.Y. Racing Ass'n, 233 F.3d 149, 157 (2d Cir. 2000).

Each of Alford's claims is subject to the burden-shifting

framework established in <u>McDonnell Douglas Corp. v. Green</u>, 411
U.S. 792, 802 (1972).  <u>See</u> <u>McMillan v. City of N.Y.</u>, 711 F.3d
120, 125 (2d Cir. 2013) (applying the framework to ADA claims);
<u>Treglia v. Town of Manlius</u>, 313 F.3d 713, 719 (2d Cir. 2002)
(applying the framework to a retaliation claim under the ADA).
Under <u>McDonnell Douglas</u>, once a plaintiff makes out a prima
facie case of retaliation or discrimination, the burden of
production shifts to the defendant to articulate a legitimate,
non-discriminatory reason for the adverse employment action.
411 U.S. at 802-03.  If the defendant produces evidence of such
a reason, the plaintiff must point to evidence sufficient to
permit a rational factfinder to conclude that the defendant's
reason is merely a pretext for discrimination or retaliation.
<u>Id.</u> at 803-04; <u>see also</u> <u>Mitchell v. Shane</u>, 350 F.3d 39, 47 (2d
Cir. 2003) (summarizing <u>McDonnell Douglas</u> similarly).[5]

Before addressing TACR's arguments for summary judgment, a
preliminary observation is in order.  In opposing summary
judgment, Alford refers to deposition testimony that he has

---

[5] As relevant to the issues in this Opinion, the Second Circuit
has applied the ADA standards in analyzing NYSHRL claims.  <u>See,
e.g.</u>, <u>Matusick v. Erie Cnty. Water Authority</u>, 2014 WL 700718, at
*10, ___ F.3d ___ (2d Cir. Feb. 25, 2014); <u>Zann Kwan v. Andalex
Group LLC</u>, 737 F.3d 834, 843-44 (2d Cir. 2013).  Accordingly,
while the law cited in this Opinion arises under the ADA, the
conclusions in this Opinion apply equally to Alford's NYSHRL
claims.

failed to provide to the Court.  Unless Alford has provided

admissible evidence to support his arguments, those arguments do

not create disputed issues of fact.  Major League Baseball

Props., Inc. v. Salvino, Inc., 542 F.3d 290, 310 (2d Cir. 2008).


I. Discharge Based on Disability Discrimination

Alford contends that TACR's decision to discharge him in

June 2010 was the product of discrimination on account of his

COPD disability, in violation of the ADA.  The ADA prohibits

"discriminat[ion] against a qualified individual on the basis of

disability in regard to [inter alia] . . . discharge of

employees."  42 U.S.C. § 12112(a).  Under the McDonnell Douglas

framework,

> to establish a prima facie case under the ADA, a
> plaintiff must show by a preponderance of the evidence
> that: (1) his employer is subject to the ADA; (2) he
> was disabled within the meaning of the ADA; (3) he
> otherwise qualified to perform the essential functions
> of his job, with or without reasonable accommodation;
> and (4) he suffered adverse employment action because
> of his disability.

McMillan, 711 F.3d at 125 (citation omitted) (emphasis added).

Under the third prong of the prima facie test, a court must

first determine the essential functions of the position.  See

id. at 126.

> Although the term "essential functions" is not defined
> by the ADA, regulations promulgated by the Equal

15

Employment Opportunity Commission ("EEOC") indicate
that it encompasses "the fundamental job duties of the
employment position."  29 C.F.R. § 1630.2(n)(1).
Evidence of whether a particular job duty constitutes
an essential function includes, <u>inter alia</u>, "the
employer's judgment as to what functions of a job are
essential" and "a written description prepared by the
employer before advertising and interviewing
applicants."  42 U.S.C. § 12111(8); <u>see also</u> 29 C.F.R.
§ 1630.2(n)(3).  Indeed, a court must give substantial
deference to an employer's judgment as to whether a
function is essential to the proper performance of a
job.

<u>McBride v. BIC Consumer Prods. Mfg. Co.</u>, 583 F.3d 92, 98 (2d

Cir. 2009) (citation omitted); <u>see also</u> <u>McMillan</u>, 711 F.3d at

126 (listing other "relevant factors that may influence a

court's ultimate conclusion as to a position's essential

functions").  "After the essential functions of the position are

determined, the plaintiff must demonstrate that he or she could

have performed these functions, with or without reasonable

accommodation, at the time of the termination or discipline."

<u>McMillan</u>, 711 F.3d at 127.

If the <u>prima facie</u> case is met, the court turns to the

second and third part of the <u>McDonnell Douglas</u> framework:

whether defendant has asserted a legitimate, nondiscriminatory

rationale, and whether plaintiff can demonstrate this rationale

to be pretextual.  Summary judgment may be granted if the

plaintiff "has not pointed to any record evidence indicating

that [the defendant's] legitimate reason for the alleged adverse

employment action is a pretext." Graves v. Finch Pruyn & Co., Inc., 457 F.3d 181, 188 (2d Cir. 2006); see also Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 173 (2d Cir. 2006) (granting summary judgment because plaintiff's argument did not raise a genuine issue of material fact that "warrant[ed] a jury trial").

TACR is entitled to summary judgment on the discharge-based discrimination claims for at least two reasons. First, Alford was not qualified to perform the essential functions of his job, with or without reasonable accommodation, and thus Alford fails to meet the third prong of the prima facie test. Second, TACR has pointed to a legitimate, non-discriminatory rationale for Alford's discharge, and Alford has not raised a genuine question of material fact, warranting a trial, that TACR's proffered rationale is pretextual.

As to the first reason for summary judgment, the essential functions of being a machine operator at TACR are not disputed: six hours of standing, two of sitting, one of walking, eight hours of reaching and manipulation of small and large objects, and some lifting and carrying. According to the SSA decision, at the time his employment was terminated, i.e., June 19, 2010, Alford lacked the physical capacity to do these things. The SSA concluded that "practically all [of Alford's] major body systems" suffered from "chronic diseases," "the cumulative

17

effect of which" was that Alford could not stand, sit, walk, reach, lift/bend, or carry, as described above.  Most important for present purposes, while Alford's respiratory issues are mentioned in the SSA decision, much more emphasis is placed on his many other infirmities -- including his morbid obesity, herniated back, weak legs, carpal tunnel syndrome, and all-around physical limitations.  Thus, the SSA decision establishes that, even if Alford's COPD had been accommodated with a HEPA respirator, he could not have performed the essential functions of his machine operator job as of the date his employment was terminated.

In response, Alford cites to Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 797-98 (1999), for the proposition that "pursuit, and receipt, of SSDI benefits does not automatically estop the recipient from pursuing an ADA claim."  Cleveland does not assist Alford.  Cleveland addressed the doctrine of judicial estoppel and gave guidance on how to treat a plaintiff's "apparently contradictory statements" to the SSA when considering an ADA claim.  Rodal v. Anesthesia Grp. of Onondaga, P.C., 369 F.3d 113, 119 (2d Cir. 2004).  As significantly, Cleveland did not relieve a plaintiff of the burden to prove that he can perform the essential functions of a job with a reasonable accommodation.  Cleveland, 526 U.S. at 806.

18

_Cleveland_ also recognized that an ADA plaintiff must proffer a sufficient explanation for any apparent contradiction arising out of an application for SSDI benefits.   _Id._

Alford has failed to explain the stark inconsistencies between his SSDI application and the SSA decision on one hand, and his disability discrimination claim here.  The SSA made a determination, after reviewing the medical evidence, that Alford lacked the physical capacity to engage in tasks that constituted the essential functions of his machine operator job as of the date of the termination of his employment.  It went so far as to find that he could not even perform sedentary work.  While Alford insists that he could have performed the essential functions of his job with the accommodation he requested -- the HEPA respirator -- this is belied by the SSA decision and entirely unsupported by the record evidence.

As to the second reason for summary judgment, TACR has pointed to a legitimate, non-discriminatory reason for Alford's discharge.  In 2010, TACR experienced a significant decline in sales, requiring a series of layoffs.  Its business shifted away from Alford's areas of expertise, and Alford was neither working on nor well-suited to work on the machinery for TACR's more demanding services.  This is a legitimate, non-discriminatory rationale for discharging Alford.

Alford fails to point to any record evidence to suggest that TACR's explanation is pretextual.  Alford's submissions include an assertion that a TACR manager told Alford that his discharge was due to "excessive absenteeism" and his medical history, but he has provided no evidence to support that assertion.

Nor has Alford created a genuine dispute as to the fact that TACR engaged in rounds of layoffs and shifted its remaining business away from the areas in which Alford was working. Alford has provided evidence that Alford's shift -- the fourth shift -- was still running in July 2010, but nothing to suggest that TACR failed to shut it down completely as the year wore on. That the entirety of Alford's shift did not cease its operations until some time after July 2010 does not raise a question of fact regarding this independent, non-discriminatory reason for the termination of Alford's employment.

Finally, Alford argues that TACR failed to provide evidence of declining revenue, of the shift of its work to the HVOF and laser processes, and of the evaluative process used to choose which employees to lay off.  To the contrary, the declarations and depositions of TACR's Chief Executive Officer, Groff, and Finnin are admissible and more than sufficient to establish the factual propositions on which TACR relies.  Thus, summary

judgment is granted on Alford's claim that TACR discharged him on account of his disability.


## II. Failure to Accommodate Discrimination

Distinct from challenging his discharge, Alford also contends that TACR failed to accommodate his COPD.  Although not entirely clear, this claim appears to be addressed to the period between March 30, 2010, when Alford provided his employer with a letter from his doctor containing the diagnosis of COPD, and June 19, when Alford left work with a torn rotator cuff.

Discrimination in violation of the ADA includes, inter alia, "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability."  42 U.S.C. § 12112(b)(5)(A); see also McMillan, 711 F.3d at 125 ("An employer may also violate the ADA by failing to provide a reasonable accommodation.").

> A plaintiff states a prima facie failure to accommodate claim by demonstrating that (1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.

McMillan, 711 F.3d at 125-26 (citation omitted).

Much of the law regarding the third prong of a failure-to-

accommodate claim -- whether the plaintiff could perform the "essential functions" with a "reasonable accommodation" -- overlaps with the third prong of the disability-motivated-discharge claim. See id. at 125-28 (applying the same law cited above in considering a failure-to-accommodate claim). Specifically, "[i]n discrimination claims based both on adverse employment actions and on failures to accommodate, the plaintiff bears the burdens of both production and persuasion as to the existence of some accommodation that would allow him to perform the essential functions of his employment." Id. at 126 (citation omitted).

As above, the analysis here too begins with determining the "essential functions" of the plaintiff's position. See id. at 126-27. "After the essential functions of the position are determined, the plaintiff must demonstrate that he or she could have performed these functions, with or without reasonable accommodation, at the time of the termination or discipline." Id. at 127. This Circuit's case law distinguishes between two aspects of this demonstration: the existence of the accommodation, and the reasonableness of the accommodation.

"[A]s to the existence of some accommodation that would allow her to perform the essential functions of her employment," "[t]he plaintiff bears the burdens of both production and

persuasion . . . ."  McBride, 583 F.3d at 97.  Moreover, "[t]he burden of persuasion on the existence of an effective accommodation is not satisfied by mere speculation."  Jackan v. N.Y. State Dep't of Labor, 205 F.3d 562, 566-67 (2d Cir. 2000).

As "to the reasonableness of a proposed accommodation," "a plaintiff bears only a light burden of production that is satisfied if the costs of the accommodation do not on their face obviously exceed the benefits."  McBride, 583 F.3d at 97 n.3; see also McMillan, 711 F.3d at 127.  "If a plaintiff suggests plausible accommodations, the burden of proof shifts to the defendant to demonstrate that such accommodations would present undue hardships and would therefore be unreasonable."  McMillan, 711 F.3d at 128.  "An 'undue hardship' is 'an action requiring significant difficulty or expense.'"  Id. (quoting 42 U.S.C. § 12111(10)(A)).

Additionally, "[t]he ADA envisions an interactive process by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated."  Jackan, 205 F.3d at 566; see also 29 C.F.R. § 1630.2(o)(3) ("To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation.").  "That being said, the ADA imposes

liability for, _inter alia_, discriminatory refusal to undertake a feasible accommodation, not mere refusal to explore possible accommodations where, in the end, no accommodation was possible." McBride, 583 F.3d at 100.

> [A]n employer's failure to engage in a sufficient interactive process does not form the basis of a claim under the ADA and evidence thereof does not allow a plaintiff to avoid summary judgment unless she also establishes that, at least with the aid of some identified accommodation, she was qualified for the position at issue.

Id. at 101.

The chronology relevant to this claim, which is described in detail above, is briefly as follows.  Alford provided a medical diagnosis of COPD to his employer on March 30, 2010, and asserts that he requested a respirator at the time.  A May 17 letter from Alford's doctor recommended that Alford use a HEPA respirator at work.  A May 21 report indicated that Alford was not medically certified to wear a respirator.  In response, TACR changed Alford's duties to remove grit blasting from his required tasks.  Less than a month later, on June 19, Alford left work with a torn rotator cuff.  He never worked again at TACR.

TACR is entitled to summary judgment on this failure-to-accommodate claim.  First, as already explained, Alford has failed to show that he could have performed the essential

functions of his job with any accommodation.  He was simply too ill.  And, according to his SSA filing, these medical conditions began on March 19, 2010, _i.e._, before the period of time that this disability claim is addressed to.

In any event, if the focus of this claim is solely on Alford's COPD, TACR made an accommodation for Alford: it eliminated his duties of grit blasting.  Alford suggests that this accommodation was not reasonable because he "requested a HEPA respirator."  But, Alford failed the medical evaluation that OSHA regulations required him to pass before he would be allowed to wear the HEPA respirator.[6]  Accordingly, this purported accommodation did not actually exist for him.  And there is nothing in the record to suggest that elimination of the grit blasting duty was not an entirely reasonable accommodation given Alford's failure of the medical examination that would have permitted him to use a respirator.  Accordingly,

---

[6] The OSHA regulations pertaining to "Respiratory Protection" in 29 C.F.R. § 1910.134 are divided into multiple sections.  Sub-section E pertains to the "Medical Evaluation" and Sub-section F pertains to "Fit testing."  It is true that, under Sub-section F, "the employee must be fit tested with the same make, model, style, and size of respirator that will be used."  29 C.F.R. § 1910.134(f) (emphasis added).  Critically, however, Sub-section E states that an employer shall "provide a medical evaluation to determine the employee's ability to use a respirator, before the employee is fit tested or required to use the respirator in the workplace."  29 C.F.R. § 1910.134(e)(1) (emphasis added).

Alford's prima facie claim fails.

Alford makes two other responses, neither of which is persuasive.  First, Alford argues that, even if he was unable to use the accommodation he requested, TACR was not absolved of the obligation to accommodate his disability.  This is curious argument, as TACR did precisely what Alford suggests.  After Alford failed the medical evaluation, TACR removed Alford from grit blasting.  In any event, it is Alford's burden to point to the existence of an accommodation that should have been provided and was not.

Second, Alford objects that TACR violated the ADA by choosing an accommodation for him and not participating in the "interactive process" of consulting with him to determine a reasonable accommodation that would have been suitable for him and TACR.  In order for a plaintiff to invoke an employer's failure to engage in an "interactive process" as a basis for ADA liability, however, the plaintiff bears the burden of identifying some accommodation, not provided by the employer, that would have enabled him to be qualified for the position at issue.  McBride, 583 F.3d at 100-01.  For the reasons set forth above, the only identified accommodation -- the HEPA respirator -- was not actually available to Alford.  And Alford has failed to identify any other accommodation.  Accordingly, no liability

lies for TACR's alleged failure to engage in an interactive process.  Thus, summary judgment is granted on Alford's claim that TACR failed to accommodate his disability.

III. Retaliation Claims

Alford also brings claims of retaliation, asserting that his employment was terminated because he complained to OSHA about his workplace and applied for worker's compensation. Section 12203(a) of the ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203(a).

To survive a summary judgment motion on his retaliation claim, Alford must first make the following prima facie showing of retaliation: that "(1) he engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took adverse employment action against him; and (4) a causal connection exists between the alleged adverse action and the protected activity."  Treglia, 313 F.3d at 719.  Although "[a] plaintiff's burden at this prima facie stage is de minimis," id. (citation omitted), some retaliation claims will

nevertheless fail at this stage.  See, e.g., Sarno v. Douglas
Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 160 (2d Cir. 1999).

"[P]rotected activity" is defined by ADA as constituting
conduct that falls into one of two categories: (a) the plaintiff
"has opposed any act or practice made unlawful by this chapter";
and (b) the plaintiff "made a charge, testified, assisted, or
participated in any manner in an investigation, proceeding, or
hearing under this chapter."  42 U.S.C. § 12203(a).  "With
respect to [this] first element of a retaliation claim, . . .
plaintiff need not establish that the conduct he opposed was
actually a violation of the statute so long as he can establish
that he possessed a good faith, reasonable belief that the
underlying challenged actions of the employer violated that
law."  Muller v. Costello, 187 F.3d 298, 311 (2d Cir. 1999)
(citation omitted).

As to the fourth prong of the prima facie case, the
plaintiff must establish a causal connection between his
protected activity and the employer's adverse employment action.
A causal connection can be proven in two ways: "(1) indirectly,
by showing that the protected activity was followed closely by
discriminatory treatment, or through other circumstantial
evidence such as disparate treatment of fellow employees who
engaged in similar conduct; or (2) directly, through evidence of

retaliatory animus directed against the plaintiff by the defendant." Gordon v. NYC Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000) (in Title VII context); Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown, 294 F.3d 35, 54 (2d Cir. 2002) (applying causation standard from Title VII retaliation claims to ADA retaliation claims).  The Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship." Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2009) (citation omitted); see also Reg'l Econ. Cmty. Action Program, Inc., 294 F.3d at 54 (applying this principle in context of ADA retaliation claim).  The lack of a bright line means that a court must "exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases." Goord, 558 at 129.

Alford's retaliation claim can be briefly summarized as follows.  At his deposition, Alford described the "protected activity" for which he was retaliated against as follows:

Question: Mr. Alford, you also are suing the company for retaliation, is that correct?

Answer: Yes.

Question: And what is the basis for your retaliation claim?

Answer: For filing the workmen's comp claim, also for

29

filing the OSHA complaint which resulted in OSHA
coming over, the ones you talked about where they came
in and inspected everything.

As described above, Alford was diagnosed with COPD on March 20,
2010.  He filed a claim on April 13 for worker's compensation
based on his COPD diagnosis, and on April 29 he complained to
OSHA about the lack of respiratory protected at TACR, among
other things.  He was discharged on June 25 and informed of this
decision on July 2.

TACR is entitled to summary judgment on the retaliation
claim.  It is questionable whether the filing of a worker's
compensation claim or an OSHA complaint qualifies as protected
activity under 42 U.S.C. § 12203(a).  See Reynolds v. Am. Nat'l
Red Cross, 701 F.3d 143, 154 (4th Cir. 2012) (holding that the
filing of a worker's compensation claim is not protected
activity under the ADA).  Even if it is assumed, however, for
purposes of this Opinion that they are protected activity,
Alford's retaliation claim still fails.

Alford has not shown that the termination of his employment
was prompted by either filing.  As already explained, Alford's
job was eliminated as part of a downsizing program that affected
many employees in addition to himself.  His entire shift was
eliminated, and he did not possess the skills necessary to run
the other processes at the TACR plant.  As fundamentally, it is

not disputed that -- as of June 19, 2010, and beginning as early as March 19, 2010 -- Alford no longer had the physical capacity to perform any manual labor.  His health conditions were many, and they were serious.  Therefore, other than the temporal proximity between the filing of the two complaints and the termination of his employment, there is nothing to suggest a causal connection between the events.  While such proximity is often enough to raise a question of fact, see e.g., Reg'l Econ. Cmty. Action Program, Inc., 294 F.3d at 54, in light of the strong evidence of independent reasons for the termination decision, that proximity is not enough to prevent summary judgment in this case.


CONCLUSION

     Defendant's September 27, 2013 motion for summary judgment is granted.  The Clerk of Court shall close the case.


     SO ORDERED:

Dated:   New York, New York
         April 17, 2014


                         _____
                              DENISE COTE
                      United States District Judge